# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| UNITED STATES OF AMERICA, | : | Case No. 1:16-cr-105 |
| --- | --- | --- |
| vs. | : | Judge Timothy S. Black |
| MARTIN McCRACKIN, | : | |
| Defendant. | : | |

## ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

This criminal case is before the Court on Defendant's motion to suppress evidence and statements (Doc. 16), and the Government's response in opposition (Doc. 21).

The Court held an evidentiary hearing on October 20, 2017, and heard testimony from Hamilton County Heroin Task Force Officer Carrie Heuser of the Cincinnati Police Department Narcotics Unit ("TFO Heuser"). (Doc. 24).[1]

## I. BACKGROUND

On November 2, 2016, Defendant Martin McCrackin was charged by way of a federal indictment with four counts, including: distribution of heroin mixtures, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Counts 1 and 2); possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count 3); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 4). The charges arise from a Hamilton County Heroin Task Force (the "HCH Task Force") investigation, in conjunction with the Fairfax, Ohio Police

---

[1] The motion became ripe for decision after the preparation and receipt of the Court-ordered hearing transcript. (Doc. 24).

Department (the "Fairfax PD"). The investigation ultimately resulted in a stop of Defendant's vehicle, a search of Defendant's person, car, and home, and a police interview subsequent to Defendant's arrest. (Doc. 16 at 6-7; Doc. 21 at 3).

Defendant moves for suppression of the evidence obtained and any statements he made. (Doc. 16). Defendant argues that his vehicle was stopped without the benefit of a warrant and in violation of his constitutional rights, and that any derivative evidence and statements obtained as a result should be excluded as fruit of the poisonous tree.

For purposes of this Order, the Court will rely upon the facts as set forth in the parties' briefs (Docs. 16 and 21), as well as the testimony and evidence proffered at the October 20, 2017 suppression hearing (Doc. 24).[2]

## II. FACTS

On October 20, 2016, the Fairfax PD called the HCH Task Force to the scene of a potential heroin overdose, located in an office building at 5725 Dragon Way in Fairfax, Ohio.[3] (Doc. 16 at 3). TFO Heuser and two other HCH Task Force Officers arrived at the scene to find a white female lying on the floor, deceased. (*Id.*) Among the items collected from the scene were the victim's cell phone, as well as a paper-fold containing suspected heroin, which was found in the victim's pocket. (Doc. 24 at 9:1-3).

---

[2] The parties' admitted exhibits during the suppression hearing. The exhibits have not been electronically filed on the docket, but are part of the record, and remain in the Court's custody.

[3] The HCH Task Force investigates incidents of fatal and non-fatal overdoses by "work[ing] the case backward," in order to identify the dealer who sold the fatal or non-fatal dose to the victim. (Doc. 24 at 8:3-5).

The HCH Task Force began investigating the presumed overdose fatality, in an effort to determine who sold the narcotics to the deceased. (Doc. 21 at 2). As part of its investigation, the HCH Task Force searched the deceased's cell phone, looking through her text messages and contacts. (*Id.*) In doing so, the HCH Task Force discovered a contact in the deceased phone, identified only as "Zee," whom the deceased had sent text messages to before her death, asking to buy heroin. (Doc. 16 at 3-4). Accordingly, the HCH Task Force believed that the contact known as "Zee" was the individual who sold the fatal dose of heroin to the deceased. (Doc. 21 at 2). However, at that time, no law enforcement officer involved in the investigation had knowledge of "Zee's" identity.

Over the next few days, TFO Heuser maintained custody of the deceased's cell phone. (Doc. 24 at 10). At some point, on or before October 25, 2016, the deceased cell phone received a text message from Zee. (*Id*. at 10-11; Doc. 21). TFO Heuser had not prompted or initiated the communication. (Doc. 24 at 12:6-11). Based on the text message, TFO Heuser concluded that Zee believed the deceased was still alive. (*Id*. at 12:25-13:3). The text message from Zee inquired whether the deceased had liked the narcotics previously provided and whether the deceased wished to purchase more. (*Id*. at 12:18-21).

Recognizing that Zee was unaware the deceased had died, TFO Heuser effectively assumed the identity of the deceased by text message and attempted to arrange another sale of narcotics. (*Id*. at 13). TFO Heuser initially arranged the "buy bust" for October 25, 2016. (Doc. 16 at 4). However, Zee did not appear on that date. (Doc. 24 at 14). TFO Heuser arranged to meet Zee the following day to purchase narcotics. (*Id*.)

Specifically, TFO Heuser, still posing as the deceased, arranged to meet Zee on October 26, 2016, in the parking lot of a Frisch's restaurant, located on Wooster Pike in Cincinnati, Ohio, to purchase $40 worth of heroin. (Doc. 16 at 4). TFO Heuser specifically selected the Frisch's parking lot because it was an open area, and it was close to the location where Zee met the deceased on the day she died (*i.e.*, it was familiar to both Zee and the deceased). (Doc. 24 at 15).

On October 26, 2016, the Fairfax PD, in marked vehicles, set up surveillance around the Frisch's parking lot. (Doc. 16 at 5). Additionally, the HCH Task Force set up covert surveillance in the parking lot, where TFO Heuser was operating in a plain clothes capacity. (*Id.*) TFO Heuser was on foot in the parking lot, and wore a recording device on a lanyard around her neck. (Gov. Ex. 2; Def. Ex. 1).

At approximately 1:34 p.m., TFO Heuser sent a text message to Zee from the deceased's phone, and asked Zee if he was close. (Doc. 16 at 5). Zee replied, "Yea." (*Id.*) Shortly thereafter, at 1:39 p.m., the HCH Task Force observed a grey four-door Ford Taurus pulling into the Frisch's parking lot. (*Id.*)

The Taurus parked in a spot near the Frisch's building, facing the street. (*Id.*) At the time, there were approximately five cars parked in the same row as the Taurus. (Doc. 24 at 19). But for the covert officers, however, none of the other cars were occupied. (*Id.*) Moreover, while other cars pulled into the parking lot within the same time frame, none of those other vehicles parked in the same row as the Taurus. (*Id.*)

Task Force Officers observed that the Taurus had temporary license plates and heavily tinted windows. (*Id.* at 20). TFO Heuser also noted that the windows of the

4

Taurus were open approximately an inch or two, and the smell of marijuana was emanating from the car. (*Id*. at 20-21).

At approximately 1:41 p.m., Zee called the deceased's cell phone, which TFO Heuser answered. (Doc. 16 at 5). Speaking to Zee by telephone was TFO Heuser's first confirmation that Zee was male. (Doc. 24 at 55-56). Beyond that, TFO Heuser still had no knowledge as to Zee's identity or appearance.

Zee, however, recognized that TFO Heuser was not the deceased and asked her to identify herself. (Doc. 16 at 5-6). TFO Heuser maintained a conversation with Zee as she approached the Taurus from behind. (*Id*. at 6; Doc. 24 at 21-22). Specifically, TFO Heuser told Zee that the deceased had gone to the building across the street from Frisch's to get another set of keys. (Doc. 24 at 22). Zee then spotted a woman walking in the parking lot of the building across the street (*i.e.*, where TFO Heuser told Zee the deceased had gone). (*Id*.) Zee asked TFO Heuser whether the woman across the street was the deceased. (*Id*.) TFO Heuser saw the same woman that Zee was referencing. (*Id*. at 23). Based on the vantage point, TFO Heuser determined that Zee must be in the Taurus. (*Id*.)

Seconds later, Zee hung up the phone, leading TFO Heuser to believe that Zee may have realized the woman in the parking lot across the street was not the deceased and that something was amiss. (*Id*. at 24). Notably, the driver of the Taurus kept the engine running the entire time the car was parked, and had not exited the car since pulling into the Frisch's parking lot. (*Id*. at 31). Within a minute, the Taurus began to back out of its parking spot. (*Id*.)

Based on their observations, TFO Heuser and the HCH Task Force concluded that Zee was the driver of the Taurus. (*Id*. at 31-33). Accordingly, the HCH Task Force and TFO Heuser began to move in and stopped the Taurus as it was backing out. (Doc. 16 at 8). The Task Force Officers ordered the driver out of the Taurus. (Doc. 24 at 37). As the driver emerged from the car, a plastic bag and a paper-fold, containing what appeared to be narcotics, fell from his lap. (*Id*.) The paper-fold was identical to that found in the deceased's pocket. (*Id*.) Additionally, TFO Heuser called Zee's phone number, which rang on the cell phone found in the driver's possession. (*Id*. at 37-38). A search of the Taurus also revealed a probation officer's business card. (Doc. 16 at 6).

The driver of the Taurus was identified as Defendant Martin McCrackin. (Doc. 24 at 38). Defendant was taken the Fairfax Police Department for an interview. (*Id*. at 39). Defendant signed an acknowledgment of his *Miranda* rights. (*Id*. at 40; Gov. 9). The interview then commenced. (*Id*. at 39).

Additionally, the Fairfax PD contacted the probation officer whose business card was found in the Taurus. (Doc. 16 at 6). Two probation officers conducted a home visit and search of Defendant's residence. (*Id*.; Doc. 21 at 3). The probation officers' search yielded three baggies of suspected heroin, three firearms, and documents confirming Defendant resided at the home. (Doc. 16 at 6). One of the firearms was determined to have been stolen. (*Id*.)

### III. STANDARD OF REVIEW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …."

U.S. Const. amend. IV.  "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).  The exclusionary rule serves to deter law enforcement from obtaining evidence by unconstitutional means.  *Nix v. Williams*, 467 U.S. 431, 442-43 (1984).  So critical is the goal of deterring violations of constitutional and statutory protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id*. at 443 (emphasis added).

A defendant may seek the suppression of evidence by filing a pretrial motion with the court.  Fed. R. Crim. P. 12(b)(3)(C).  "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir.2003)).  However, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002);

*Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it") (quotation marks and citations omitted).

## IV. ANALYSIS

Defendant moves to suppress all evidence obtained as a result of the warrantless search of his person, vehicle, and home, as well as any statements he subsequently made to law enforcement. (Doc. 16). Defendant argues that he "was not committing a traffic offense or any offense when he was stopped…." (*Id.* at 8). Accordingly, Defendant argues that officers had neither probable cause to conduct a traffic stop, nor reasonable suspicion to warrant an investigative stop. (*Id.* at 8-10). The Court disagrees.

### A. Officers Had Reasonable Suspicion to Stop the Vehicle

"It is well established that a police officer lawfully may stop a car when he has [either] probable cause to believe that a civil traffic violation has occurred, <u>*or* reasonable suspicion of an ongoing crime</u>." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (emphasis added). "Reasonable suspicion must be 'supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *United States v. Flores*, 571 F.3d 541, 544 (6th Cir. 2009) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (internal quotation marks omitted). "The court should consider the 'totality of the circumstances' and evaluate whether the detaining officer had a 'particularized and objective basis' for suspecting wrongdoing." *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

Here, the totality of the circumstances gave the officers a reasonable, articulable suspicion that the driver of the Taurus was the individual known as "Zee," who had

arrived at the Frisch's parking lot that day to sell narcotics and, possibly, that "Zee" was the person who sold the fatal dose of heroin to the deceased. Indeed, TFO Heuser articulated that suspicion best during cross-examination, stating:

> Through my training, knowledge, and experience of conducting several of these covert operations, it's very common that, when somebody says they're on their way, they show up soon after, or not. The fact that this individual pulled into the lot, never got out of the vehicle, never turned off the vehicle, the emission of marijuana, the tinted windows, all of that is common with drug traffickers. Tinted windows are often to conceal their identity or their activity in their vehicle. He never got out of the vehicle. The fact that he saw the same individual cross the parking lot … And then either he figured out that wasn't Cat and made me and decided that he did not want to go through with the narcotic exchange for currency.
>
> …
>
> I could articulate through the texting and the conversation that I had that … [the driver of the Taurus was] a subject known to me as Zee or someone that was arriving to exchange a narcotic.

(Doc. 24 at 63:8-64:21).

Here, the officers were engaged in an ongoing investigation to determine who sold a lethal dose of heroin to the deceased. In the course of that investigation, the Task Force Officers determined that an individual known only as "Zee" was likely the source of the narcotics. The person known as "Zee" later sent a text message to the deceased, believing her to still be alive, and offered to sell her additional heroin. TFO Heuser, who was in possession of the deceased's cell phone, saw the text message and pretended to be the deceased in order to set up a meeting with "Zee" to purchase additional narcotics.

9

That meeting was arranged for October 26, 2016 in a Frisch's parking lot, across the street from where the deceased last met "Zee" and where she was ultimately found dead.

On October 26, 2016, TFO Heuser waited on foot in the Frisch's parking lot for "Zee" to arrive. Also present were Task Force Officers and Fairfax PD officers. As she waited, TFO Heuser, pretending to be the deceased, communicated with "Zee" via text message from the deceased's cell phone. Specifically, TFO Heuser exchanged text messages with "Zee," who stated he was "close" to arriving at Frisch's. Within minutes, the grey Taurus with temporary plates and heavily tinted windows pulled into the parking lot. The driver stopped the car, but did not exit and left the engine running. Later, as TFO Heuser approached the vehicle, she further noted the odor of marijuana emanating from the Taurus.

Less than two minutes after the Taurus's arrival, "Zee" called the deceased's cell phone to ask if she was present. When TFO Heuser answered the call, "Zee" recognized that the woman on the phone was not the deceased. However, while speaking to TFO Heuser, "Zee" made reference to a woman in the parking lot across the street. Based on the location of the woman "Zee" referenced, as well as the location and direction of the other cars on the lot, TFO Heuser determined "Zee's" general location. Notably, the Taurus was the only vehicle in that general area that pulled in within the time frame of "Zee" announcing he was close and then calling the deceased cell phone. Indeed, other than the other Task Force Officers, the Taurus was the only vehicle in that general area that was even occupied at the time.

Finally, after speaking with TFO Heuser, "Zee" hung up the phone and, within a minute or two, the reverse lights on the Taurus engaged and the car began to back out.

Based on the totality of the circumstances, the Court finds that the officers had a reasonable, articulable suspicion that the driver of the Taurus was the individual known to them only as "Zee," who was present to sell narcotics, and who had likely sold the fatal dose of heroin to the deceased.

**B. Officers had Probable Cause to Search the Vehicle and Arrest Defendant**

First, the search of Defendant's vehicle was permissible under the automobile exception. Moreover, the officers had probable cause to arrest Defendant.

*1. Automobile Exception*

"Under the automobile exception to the warrant requirement, an officer may perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). "Probable cause is a reasonable ground for belief supported by less than *prima facie* proof <u>but more than mere suspicion</u>." *United States v. Blair,* 524 F.3d 740, 748 (6th Cir. 2008) (emphasis added). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *California v. Acevedo*, 500 U.S. 565, 570 (1991) (internal quotation marks and citations omitted).

As previously stated, the HCH Task Force stopped Defendant's vehicle based on reasonable suspicion that the driver had sold a lethal dose of heroin to a woman just days earlier. Based on their training and observations, the HCH Task Force and TFO Heuser

11

believed that the driver of the Taurus was "Zee," (later identified as Defendant) who had arrived to sell more heroin to the deceased.

Upon stopping the Taurus and ordering the driver out of the vehicle, a paper-fold and plastic bag containing suspected narcotics fell from the driver's lap. Notably, the paper-fold looked exactly like the one retrieved from the deceased's pocket. Additionally, the driver's cell phone rang when TFO Heuser called the phone number associated with "Zee," with whom she had arranged to purchase heroin. Under the circumstances, the officers had ample probable cause to believe that the vehicle contained contraband or evidence of criminal activity.

Accordingly, the officers' warrantless search of the vehicle was permissible under the automobile exception.

### 2. *Probable Cause to Arrest*

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citing *United States v. Watson,* 423 U.S. 411, 417–24 (1976)). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable … officer, amount to probable cause." *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) (quoting *Maryland v. Pringle,* 540 U.S. 366, 371(2003)) (internal quotations marks omitted).

For all the reasons previously articulated, *supra*, the Court finds that the officers had probable cause to believe that Defendant was "Zee," that he was present at the Frisch's parking lot to sell narcotics, and that he was the individual who had sold the fatal dose of heroin to the deceased.

### C. Derivative Evidence Was Appropriately Obtained

Finally, Defendant argues that all derivative evidence and statements obtained are 'fruit of poisonous tree' and should be suppressed. However, as the Court has already found that the stop and search of the Taurus were appropriate, and Defendant's arrest was supported by probable cause, there is no 'poisonous tree' at issue.

Moreover, as to the statements Defendant made during the police interview, Defendant was provided with a written copy of his *Miranda* rights, which he signed acknowledging receipt. (Gov. Ex. 9). Admittedly, Defendant did not sign the bottom portion of the form, which constitutes a written waiver of those rights. (*Id*.) However, Defendant does not argue to this Court that he did not waive his *Miranda* rights, nor does he argue that he invoked his right to counsel. Rather, Defendant's argument is solely that his statements should be suppressed, because the interview resulted from Defendant's allegedly unlawful stop and arrest. However, the Court finds nothing impermissible about the stop or arrest. Thus, Defendant's argument that the statements should be suppressed lacks merit.

Accordingly, suppression of any evidence obtained as a result of the stop and Defendant's arrest is not warranted.

## V. CONCLUSION

In sum, the Court finds that the initial investigative stop was valid, and the officers had probable cause to conduct a search of the vehicle under the Automobile Exception to the Fourth Amendment warrant requirements. Thus, the derivative evidence obtained is not "fruit of the poisonous tree."

Based upon the foregoing, Defendant's motion to suppress evidence and statements (Doc. 16) is **DENIED**.

**IT IS SO ORDERED.**

Date: 3/28/2018

*s/ Timothy S. Black*
Timothy S. Black
United States District Judge